UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JESSE KNERR,

                                   Plaintiff,

            v.

HENRY RICHARDS, PH.D.,

                                   Defendant.

No. C08-5021 RJB/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  December 11, 2009**

Before the Court is the motion for summary judgment of Defendant Henry Richards, Ph.D. (hereinafter "Dr. Richards).  Dkt. 66.  Plaintiff, Jesse Knerr, did not file a response.  Under Local Rule 7 (b)(2) failure to file papers in opposition to a motion may be deemed by the Court as an admission that the motion has merit.

Having carefully reviewed the motion and balance of the record, and viewing the evidence in the light most favorable to Mr. Knerr, the undersigned recommends that Dr. Richard's motion for summary judgment be granted.

### BACKGROUND AND STATEMENT OF FACTS

The following background summary and recitation of facts is based on the verified complaint, and the declarations and exhibits filed in support of Defendant's motion, which are not disputed by Plaintiff.

REPORT AND RECOMMENDATION - 1

Plaintiff Jesse Knerr is a sexually violent predator civilly committed to the Department of Social and Health Services (DSHS), Special Commitment Center (SCC), pursuant to Wash. Rev. Code ch. 71.09. A King County Superior Court committed Mr. Knerr to the SCC in 2005. Dkt. 66, p. 1. Defendant is Henry Richards, Ph.D., former SCC Superintendent. Dr. Richards was superintendent of the SCC from September 2004 until May 2009. *Id.*

Mr. Knerr filed this civil action claiming generally that (1) Dr. Richards violated his due process and equal protection rights by placing him in the intensive management unit (IMU) for an extended period of time; (2) Dr. Richards negligently supervised and/or hired staff who abused Mr. Knerr; (3) Dr. Richards violated his Eighth Amendment rights in failing to protect him from abuse by other residents, and (4) that the plaintiff has been denied court access. Dkt. 18. Mr. Knerr seeks declaratory and injunctive relief, attorneys' fees and costs, compensatory, special, actual, punitive, and general damages, and a transfer to Western State Hospital. Mr. Knerr also asks this Court to appoint an independent special master to investigate alleged criminal acts at the SCC. *Id.*, pp. 41-42.

A.      **The September 11, 2007 Assault**

On September 11, 2007, Mr. Knerr and two other residents entered the bedroom assigned to SCC resident, L.A., and began assaulting L.A. Dkt. 68 at ¶ 4. SCC staff had to enter the bedroom to pull Mr. Knerr and the other assailants out of the room to stop the assault. *Id.* at ¶ 5. Mr. Knerr and the other assailants each received a Category 1 Behavior Management Report (BMR) [1]1 for physical assault. Dkt. 69 at ¶ 6. The SCC referred the incident to the Pierce County Sheriff's Office, which declined to prosecute. *Id.* at ¶ 7.

---

[1] Disciplinary action for inappropriate behavior and violation of SCC policy occurs following an administrative review process. *See* Dkt. 69 (Declaration of Cathi Harris) at ¶ 3. Administrative review

Earlier the same day, Mr. Knerr received another Category 1 BMR for willful interference with staff based on Mr. Knerr's refusal to comply with three staff directives to leave the fresh air pad and return to his room.  Dkt. 69 at ¶ 8.

Due to the multiple Category 1 BMRs, including one for physical assault, SCC placed Mr. Knerr under intensive management conditions pursuant to SCC Policy 406 on September 11, 2007.  Dkt. 70 (Declaration of Leslie Sziebert, M.D.) at 4. The IMU is comprised of six resident bedrooms in the Alder South Housing Unit.  Dkt. 69 at ¶ 7. Residents placed in IMU are segregated from the rest of the SCC population.  *Id.* at ¶ 7. A resident may be placed in IMU to preserve the safety and security needs of the institution based on a professional assessment of the resident.  *Id.* at ¶ 8. SCC may place a resident under intensive management if a resident's behavior endangers others, himself, or represents a risk to the safety and security of staff and the institution.  *Id.* Clinical staff, in this case Dr. Leslie Sziebert, performs the assessment and determines the appropriate conditions for intensive management based on his/her professional judgment.  *Id.* at ¶ 9. The conditions, which change as the resident's behavior changes throughout the period of segregation, are reduced to writing.  *Id.* at ¶ 10.

On September 21, 2007, ten days after SCC placed Mr. Knerr under intensive management, Dr. Richards issued a directive (Directive 004) to supplement processes already in place for intensive management. Dkt. 67 (Declaration of Henry Richards, Ph.D.) at ¶ 3.  He issued the directive to improve the current intensive management process to better provide for the safety and security of residents and staff.  *Id.* This directive immediately implemented a

---

hearings are conducted pursuant to former SCC Policy 235, *Behavioral Interventions* (now SCC Policy 238). Dkt. 69 at ¶ 3. Administrative review hearings are held only for Category 1 BMRs. *Id.* at ¶ 4.  Category 1 BMRs are issued for serious infractions including assault, intimidation, extortion, contraband, and multiple Category 2 BMRs. *Id.* at ¶ 4. BMRs are generally written by Residential Rehabilitation Counselors (RRCs) who interact directly with the residents on a daily basis on the living unit. *Id.* at ¶ 5. The BMR is sent to the SCC Investigator for investigation. *Id.* at ¶ 6. The SCC Investigator interviews the persons involved in or who witnessed the incident. *Id.* at ¶ 6.

number of new protocols for intensive management including: (1) assignment to the IMU beyond a 24-hour period required the written approval of the superintendent or designee; (2) at least once per week, the conditions of administrative placement on IMU were to be reviewed by the staff psychologist and program area manager for program area 1; and (3) at least monthly, continuation on administrative placement on IMU was to be reviewed by the superintendent based on consensus recommendations of the clinical director and program services manager. Dkt. 67 at ¶ 4. SCC applied the updated protocols to Mr. Knerr the same day Dr. Richards published the directive. On that day, Dr. Richards issued a Superintendent's Notice to the staff psychiatrist, the clinical director, the associate superintendent for treatment and care, the manager for program area 1 and the on-site administrators, that pursuant to Directive 004, Mr. Knerr was to remain on IMU status pending written approval of removal by Dr. Richards. Dkt. 67 at ¶ 5 and Attach. B thereto. The primary purpose for Mr. Knerr's IMU placement was for the safety and security of Mr. Knerr, other SCC residents, and staff. Dkt. 67 at ¶ 6.

Mr. Knerr remained in IMU on the Alder South housing unit for approximately three Weeks until February 12, 2008. Dkt. 70 at ¶ 5. SCC then moved him to a quiet room on the Dogwood housing unit. *Id*. The quiet room on this unit is the bedroom closest to the staff desk which allows staff to monitor the resident in the room much more closely than other resident bedrooms. *Id*. Mr. Knerr stayed on this unit in the quiet room until approximately February 12, 2008, when SCC moved Mr. Knerr to a standard resident room on the Fir living unit. Dkt. 70 at ¶ 6. Mr. Knerr was on IMU status for approximately five months. *Id*. at ¶ 7. During this time, Dr. Sziebert reviewed Mr. Knerr's status on a weekly basis and made changes as necessary per protocol. *Id*. The Placement Move Committee also reviewed Mr. Knerr's status on a regular basis during this time. *Id*. at ¶ 8. The Placement Move Committee consisted of the program area

REPORT AND RECOMMENDATION - 4

managers, Dr. Sziebert, and a rotating position of either an associate superintendent, the island operations manager, or the program services manager. *Id*.

When making decisions about Mr. Knerr's status, Dr. Sziebert and the Placement Move Committee considered Mr. Knerr's past behavior in the institution, his treatment needs, the fact that he assaulted another resident before the September 11, 2007, assault, and his allegations that he was being abused, threatened, and harassed by other residents. *Id*. at ¶ 9. It was Dr. Sziebert's opinion, based on the exercise of his professional judgment, that in light of the above factors, it was necessary for Mr. Knerr to remain under intensive management conditions during those months. *Id*. at ¶ 10. Dr. Richards reviewed the facts that Dr. Sziebert and the clinical team gathered in making their consensus recommendation. In exercising his professional judgment, Dr. Richards approved Dr. Sziebert's and the clinical team's recommendations. Dkt. 67 at ¶ 13.

**B.     Harassment By Other Residents**

In his Amended Complaint, Mr. Knerr alleges that numerous other SCC residents physically and sexually abused him, and also that other residents subjected him to daily threats, harassment, and intimidation. Dr. Richards became aware of Mr. Knerr's allegations sometime in late 2007 or early 2008 when Dr. Sziebert brought the matter to Dr. Richards' attention. Dkt. 67 at ¶ 7. A meeting was convened on January 14, 2008, to discuss Mr. Knerr's concerns. Present at the meeting were Mr. Knerr, Dr. Richards, and program area 2 manager James Anderson. At the meeting, Mr. Knerr stated that if he were allowed to move unaccompanied around the SCC campus, he might act out towards other residents. Dr. Richards told Mr. Knerr that after the SCC completed an investigation, he would make decisions regarding the

appropriate course of action.  Dr. Richards sent Mr. Knerr a letter memorializing the meeting on January 28, 2008.  Dkt. 67, Attach. C thereto.

Dr. Richards then directed Dr. Sziebert to convene a meeting of SCC treatment and operations staff to discuss long term placement and safety for Mr. Knerr.  Dkt. 67 at ¶ 10.  On February 6, 2008, Dr. Richards sent a memo to James Anderson, the program area manager for the housing unit where Mr. Knerr was living, regarding Mr. Knerr's placement and status.  Dkt. 67 at ¶ 11 and Attach. D thereto. The memo notified Mr. Anderson that Dr. Sziebert was convening a meeting to review the clinical and residential measures needed to return Mr. Knerr to the general SCC population.  *Id.*  Dr. Sziebert was to issue a revised placement and management plan for Mr. Knerr which Mr. Anderson was to implement. *Id.*

On February 12, 2008, at Dr. Richards' direction, SCC employees staffed Mr. Knerr's case.  Present at the meeting was the SCC clinical director Dr. Cary Sturgeon, assistant clinical director Dr. Natasha Chung, operations manager Kelly Cunningham, program services manager David O'Connor, the program area managers Jim Anderson, Walter Weinberg and Al Nerio, and Mr. Knerr's treating psychiatrist Dr. Sziebert.  Dkt. 70 at ¶ 11 and Attach. B thereto.  The purpose of the meeting was to discuss how to safely integrate Mr. Knerr back into the SCC population.  Dkt. 70 at ¶ 11. The group, exercising their collective professional judgment determined it was in Mr. Knerr's best interest to receive his meals on his living unit and to have escorted movements when not on his living unit.  Dkt. 70 at ¶ 12. This decision was based on Mr. Knerr's statements regarding threats from specific residents.  *Id*. The participants decided to seek Dr. Richards' approval to manage Mr. Knerr outside of the usual policies to address Mr. Knerr's unique safety issues. Dkt. 70 at ¶ 13.

The next day, Dr. Sziebert sent Dr. Richards a request to manage Mr. Knerr outside of

REPORT AND RECOMMENDATION - 6

SCC policies based on Mr. Knerr's stated concerns for his safety. Dkt. 70 at ¶ 14 and Attach. C thereto.  Dr. Richards then approved the recommendation to manage Mr. Knerr's concerns outside of policy and directed that there was to be a monthly review of Mr. Knerr's status.   Dkt. 67 at ¶ 12 and Dkt. 70, Attach. C thereto.

SCC then moved Mr. Knerr to a standard resident room on the Fir housing unit.  Dkt. 70 at 15.  Currently Mr. Knerr is placed on the Gingko living unit where he is separated from the residents he claims threatened him.  Dkt. 70 at ¶ 15.

In his Amended Complaint Mr. Knerr claims he was sexually abused and raped by more than one resident.  Dkt. 18, pp. 14, 17 and 32.  During Mr. Knerr's June 16, 2009 deposition, he denied those allegations, testifying under oath:

> MS. GREENWALD: Were there other times of sexual assault?
>
> MR. KNERR: No. That was the only one.
>
> MS. GREENWALD: From Mr. Robinson or anyone else?
>
> MR. KNERR: That is correct.

Dkt. 66, Exh. 1 (Deposition of Jesse Knerr, June 16, 2009) at 49-50.

> MS. GREENWALD: In your complaint you'd said that you were -- you used the -- quote, the word "raped" repeatedly, and then when we were talking here you said that was the only incident of sexual abuse that occurred, so --
>
> MR. KNERR: Should have-should have only been that one.
>
> MS. GREENWALD: Okay. So there -- I just want to clarify that you've never been raped by anyone here at SCC. You're not claiming that?
>
> MR. KNERR: No. I'm claiming that Jeffrey Robinson physically put my fucking hand on his dick, yeah.
>
> MS. GREENWALD: Okay. So it was that --

REPORT AND RECOMMENDATION - 7

MR. KNERR: That's the only thing.

MS. GREENWALD: Is that the night that -- involving the sheet? [2]

MR. KNERR: Yes.

MS. GREENWALD: Is that the same night?

MR. KNERR: Yes. Yes.

MS. GREENWALD: Okay. So --

MR. KNERR: I consider that rape, yes.

MS. GREENWALD: Okay. But it only happened once?

MR. KNERR: It was a one-time thing, yes, and I confronted him about it, and it never happened afterwards.

MS. GREENWALD: Okay. No other people, no other sexual assault incidents with anyone else?

MR. KNERR: No.

Dkt. 66, Exh. 1 at 94.

## C. SCC's Legal Resources Available To Residents

All SCC living units have on-unit legal computers, complete with legal resources including Westlaw's Premise application. Dkt. 71 (Declaration of Becky Denny) at ¶ 2. Databases include the U.S. Supreme Court, Ninth Circuit Court of Appeals, Washington Court of Appeals and Supreme Court cases, the Washington Administrative Code, and the Revised Code of Washington. *Id.* at ¶ 2. The SCC also keeps copies of the Prison Litigator's

---

[2] Mr. Knerr alleged that on April 26, 2006, another resident, J.R., soiled his bedding. Dkt. 18, p. 14. In his deposition testimony, Mr. Knerr further explained that on the night in question, after taking four contraband narcotic pills, he awoke to find J.R. standing over him, masturbating over his bed and that J.R. put Mr. Knerr's hand on J.R.'s penis. *See* Dkt. 66, Exh. 1 at 49, 95. After Mr. Knerr told SCC staff about the incident, the SCC took the sheet where the other resident allegedly ejaculated to preserve it as potential evidence. *See* Dkt. 68 at ¶ 9. Mr. Weeks referred the incident to the Pierce County Sheriff's Office which declined to prosecute. *Id.*

Handbook in the SCC library. *Id.* at ¶ 2. The SCC subscribes to advance sheets which are maintained in binders in the SCC Library for the federal Circuit Courts of Appeal, the U.S. Supreme Court and the Federal Appendix. *Id*. at ¶ 3. The legal network is available for resident use daily from at least 6:00 a.m. to 10:00 p.m., except during resident count. *Id*. at ¶ 4.

The SCC also keeps legal reference books in its central library collection. *Id*. at ¶ 5. Titles include Black's Law Dictionary (four copies), Official Advance Sheets – Washington Appellate Reports (beginning with 125 Wash. App. 589), Official Advance Sheets – Washington Reports (beginning with 155 Wash.2d 549), Washington Blue & White Book (2005 Cumulative pamphlet), Washington Reports 2nd Series (Abortion – Extradition), West's Federal Reporter Second Series (beginning with 363 F. Supp. 2d 1), West's Federal Reporter Third Series and Federal Appendix (beginning with 126 Fed. Appx. 1), West's Federal Supplement Second Series (beginning with 371 F. Supp. 2d 1), West's Pacific Reporter Third Series (beginning with 109 P.3d 914), West's Supreme Court Reporter (beginning with 125 S. Ct. 1752), and West's Washington Reporter (beginning with 109 P.3d case name index).  *Id*. at ¶ 5.

**STANDARD OF REVIEW**

Basic and fundamental to any 42 U.S.C. § 1983 action is an inquiry focusing on whether the plaintiff has been denied a right of constitutional significance. *Parratt v. Taylor*, 451 U.S. 527, 532, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), overruled on other grounds; *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L Ed. 2d 662 (1986). The Civil Rights Act is not a font of tort law. *Parratt*, 451 U.S. at 544. The particular harm complained of must be scrutinized in light of the specifically enumerated rights and privileges protected by the United States Constitution.  *Baker v. McCollan*, 443 U.S. 137, 140, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979).

Liability under § 1983 is premised on a defendant's personal participation in the deprivation of a constitutional or other federal right. *E.g., Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988). No defendant can be found vicariously liable under § 1983 pursuant to a theory of respondeat superior. *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 690-94, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). "Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss." *Ivey v. Board of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). To go forward, therefore, the plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution. His claims fail if he is unable to do so.

In order to survive a motion to dismiss, a complaint must also contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009), *citing Bell Atlantic v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). *Iqbal* held that the plausibility standard announced in *Twombly* means that Fed. R. Civ. P. 8(a)(2) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949. "[N]aked  assertion[s]" of illegal conduct devoid of "further factual enhancement" do not suffice. *Id*., quoting *Twombly*, 550 U.S. at 557. Instead, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.*, quoting *Twombly*, 550 U.S. at 570.

Facial plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," and thus a complaint that contains "facts that are 'merely consistent with' a

REPORT AND RECOMMENDATION - 10

defendant's liability . . . 'stops short of the line between possibility and plausibility of 'entitlement to relief.''' *Id*., quoting *Twombly*, 550 U.S. at 556-57. *Iqbal* explains that two rules apply to assessment of the allegations contained in a pleading: first, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *Id*. at 1949; and second, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Id*. at 1950, quoting Fed. R. Civ. P. 8(a)(2).

Under *Iqbal*, a court applying these rules to a motion to dismiss begins "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 1950. After disregarding those allegations, the court assumes the truth of the remaining, well-pleaded allegations and makes a second determination: whether the remaining allegations "plausibly give rise to an entitlement to relief." *Id*. Those judgments are "contextspecific" and require "the reviewing court to draw on its judicial experience and common sense." *Id*.

**DISCUSSION**

**A.    Well-Pleaded Allegations**

As instructed by *Iqbal*, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. *Iqbal*, 129 S.Ct. at 1950. "We next consider the factual allegations in the complaint to determine if they plausibly suggest an entitlement to relief." *Id*. at 1951. Under this test, Mr. Knerr alleges numerous allegations within his 49 page complaint that are no more than conclusions. For example, Mr. Knerr alleges that (1) SCC is not a viable treatment facility (Dkt. 18, p. 21); (2)  SCC is not licensed by any professional accrediting agency (*id.*, p. 21); (3) Dr. Richards and his subordinates have been

"obdurate, wanton, negligent, unprofessional and recently, ever more punitive in the policies, practices and procedures used at the S.C.C." (*id.*, p. 21); (4) Defendant Richards and his subordinates consistently and arbitrarily violate those generally accepted professional standards of care and practices utilized in the relevant scientific community (*id.*, p. 22); (5) Dr. Richards allows "deviant, immoral, incompetent and corrupt staff;" and that the possession of illegal drugs, alcohol and child pornography in S.C.C. has grown "exponentially" since Dr. Richards became superintendent, and that Dr. Richards "knew of, ignored, allowed, aided, abetted, encouraged and incited others to engage in acts violating Plaintiff's constitutional rights." (*id.*, pp. 23-27); (6) that Dr. Richards has been negligent in the hiring of "often undereducated, individuals who it appears, often have their own personal and pyschological problems to include the provision of illegal materials to S.C.C. residents, in direct or indirect consequence to Plaintiff." (Dkt. 18, p. 30); (7) that Dr. Richards trained individuals hired in the processes and procedures "more usually utilized in prison situations, and apparently not in the attitudes, or professional standards used in a professional mental health program and facility, and have thereby directly or indirectly impacted Plaintiff herein" (Dkt. 18, pp. 30-31). These allegations are not entitled to the presumption of truth as they are no more than legal conclusions devoid of factual support.

The well-pleaded allegations in Mr. Knerr's Amended Complaint may be summarized as follows: (1) that he was wrongfully placed in "ongoing isolation in IMU and on IMU status in violation of his due process and equal protection rights (Dkt. 18, p. 8-12); (2) that he was abused by staff and other residents and that Dr. Richards knew or should have known, but acted with wanton disregard as to this treatment (Dkt. 18, pp. 13-19); (3) that he has been denied access to a law library (Dkt.18, PP. 29-30); and (4) that he was assaulted and his property was stolen and

that Dr. Richards knew and/or did nothing to prevent this treatment. Dkt. 18, pp. 12-12. Mr. Knerr also claims that Dr. Richards is liable for the intentional infliction of emotional distress and that the negligent supervision, hiring and/or training of SCC staff. See, e.g., *id*., pp. 32-33.

**B.    Placement Under Intensive Management**

The Due Process Clause protects persons from being deprived of life, liberty, or property without due process of law. The two types of due process are substantive and procedural. *DeKalb Stone, Inc. v. County of DeKalb, Georgia*, 106 F.3d 956, 959 (11th Cir. 1997), reh'g and suggestion for reh'g en banc denied, 116 F.3d 494 (11th Cir. 1997) and cert. denied, 522 U.S. 861, 118 S. Ct. 163, 139 L. Ed. 2d 107 (11th Cir. 1997). Substantive due process applies to fundamental rights, i.e., a right created by the Constitution itself, and a governmental actor's arbitrary and capricious action caused the deprivation, regardless of the procedures used to facilitate that deprivation. *County of Sacramento v. Lewis*, 523 U.S. 833, 845-47, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998). Procedural due process ensures a fair decision making process when the government acts to deprive a person of a protected interest. *Fuentes v. Shevin*, 407 U.S. 67, 81, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972).

The test for the imposition of liability on complaints about the treatment program at SCC is the deferential professional judgment standard enunciated in *Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982). In *Youngberg*, the Supreme Court first recognized that involuntarily committed persons have a constitutional right to "minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Youngberg*, 457 U.S. at 319. The court, however, cautioned against imposing expansive obligations on the states in their care of such persons: "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for

the courts to specify which of several professionally acceptable choices should have been made." *Id*. at 321. The *Youngberg* court further explained the significant degree of deference to be afforded the decisions of qualified professionals:

> By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized.
> * * *
> For these reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Id*. at 322-23 (emphasis added, footnotes omitted).

In sum, constitutionally adequate mental health treatment is that based on the professional judgment standard. *Id*. at 321-22. This means that decisions made by professionals[3] are presumptively valid. *Id*. at 323; see also *Kansas v. Hendricks*, 521 U.S. 346, 368 n.4, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) (the professional judgment standard gives the State wide latitude in developing treatment regimens for sexually violent predators). It is this deferential standard against which Mr. Knerr's claims must be considered.

Mr. Knerr alleges that on September 11, 2007, "without any due process whatsoever," he was locked down in the IMU for the minor infraction of not leaving the smoking pad when told to do so by a staff member. Dkt. 18, p. 8. Mr. Knerr alleges that "punitive, long term 'isolation' for such a minor infraction" amounts to cruel and unusual punishment. *Id.* Mr. Knerr alleges that the "unwritten" reason he was placed in IMU was because he and two other residents "physically assaulted another S.C.C. resident (L.A.]" and that L.A. provided "more than ample

---

[3] A professional decision maker is defined as "a person competent, whether by education, training or experience, to make the particular decision at issue." *Youngberg*, 457 U.S. at 323 n.30.

REPORT AND RECOMMENDATION - 14

reason for the assault upon him." *Id.*, p. 9. Mr. Knerr acknowledges that he was in the IMU for approximately two and one-half weeks before being transferred to the quiet room on the Dogwood living unit, where he was kept for an additional four months, three weeks. *Id.* Mr. Knerr alleges that he was "isolated and punished for a total of five months, three days under punitive conditions." *Id.* During this time, Mr. Knerr alleges that he was never visited by a psychologist, psychiatrist or other clinician; was not allowed to speak to his forensic therapist or family members; and that he was held longer than two other residents involved in the physical assault. *Id.*, p. 10. Mr. Knerr alleges that he was unlawfully imprisoned and when allowed out of his cell, he was handcuffed behind his back and staff would clip a dog leash to the handcuffs and lead him around the living unit and facility yard to punish him. See, e.g., *id.*, p. 38

The uncontroverted evidence before the Court indicates Mr. Knerr was placed under intensive management conditions (IMU) following multiple Category 1 BMRs, including one for physical assault. Dkt. 70 at ¶ 4.

During the five months that Mr. Knerr was on IMU status, Dr. Sziebert reviewed his status on a weekly basis and made changes necessary pursuant to SCC protocol. *Id*. at ¶ 7. The Placement Move Committee (consisting of the program area managers, Dr. Szierbert, and a rotating position of either an associate superintendent, the island operations manager, or the program services manager) also reviewed Mr. Knerr's status on a regular basis during this time. *Id*. at ¶ 8. When making decisions about Mr. Knerr's status, Dr. Sziebert and the Placement Move Committee considered Mr. Knerr's past behavior in the institution, his treatment needs, the fact that he assaulted another resident before the September 11, 2007, assault, and his allegations that he was being abused, threatened, and harassed by other residents. *Id*. at ¶ 9. It was Dr. Sziebert's opinion based on the exercise of his professional judgment that in light of the above

REPORT AND RECOMMENDATION - 15

1 factors, it was necessary for Mr. Knerr to remain under intensive management conditions during

2 those months.  *Id*. at ¶ 10.   Dr. Richards approved the clinical team's recommendation that Mr.

3 Knerr remain under intensive management conditions during those months based on his review

4 of the facts that Dr. Szierbert and the clinical team gathered in making their consensus

5 recommendation.  Dkt. 67 at ¶ 13.

6          Viewing the evidence before the court in the light most favorable to Mr. Kneer, the court

7 concludes that Dr. Richards exercised his professional judgment in concurring with and

8 approving Mr. Knerr's placement.  Dr. Richards reviewed the facts that Dr. Sziebert considered

9 when making his recommendations.   Dr. Richards concurred with Dr. Sziebert's professional

10 opinion that Mr. Knerr should remain in IMU and later in a less restrictive living environment,

11 but under IMU conditions. This opinion was based on Mr. Knerr's history and his recent

12 disclosures regarding abuse, threats, and harassment from other residents. Because Dr. Richards

13 exercised his professional judgment in approving Mr. Knerr's status and

14 placement, it therefore cannot be said that Dr. Richards violated Mr. Knerr's substantive due

15 process rights.

16          To the extent that Mr. Knerr claims that Dr. Richards violated his right to equal

17 protection because the two other residents involved in the September 11, 2007 assault were

18 removed from IMU sooner than he was, this claim fails.  Mr. Knerr has failed to demonstrate

19 that he was similarly situated to the other two assailants because Mr. Knerr has presented no

20 evidence indicating that the two residents were the target of other residents' abuse (a reason for

21 continuing Mr. Knerr's placement under IMU restrictions), or that they have the same behavioral

22 history as Mr. Knerr does.  The uncontroverted evidence before the court reflects that Dr.

23 Richards and the treatment team individualized the treatment given to Mr. Knerr.

Therefore, the undersigned recommends that Mr. Knerr's claims that he was falsely imprisoned, improperly punished or denied due process relating to his placement or time in IMU should be dismissed.

**C.    Eighth Amendment Claims of Cruel and Unusual Punishment**

**1.    Assaults by Other Residents**

Mr. Knerr claims Dr. Richards subjected him to cruel and unusual punishment and violated his substantive due process rights in violation of the Eighth and Fourteenth Amendments of the United States Constitution.  In this regard, Mr. Knerr alleges that Defendant Richards knew or should have known, of Plaintiff's multiple complaints of sexual and physical assaults upon him by other residents.  Dkt. 18, p. 19.[4]

The Eighth Amendment addresses punishment of persons imprisoned for a crime.  *Estelle v. Gamble*, 429 U.S. 97, 102-103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976).   The rights of one who is civilly committed are analyzed using the same standards that apply to pretrial detainees.  *Jones v. Blanas*, 393 F.3d 918, 931-32 (9th Cir. 2004).  While courts borrow Eighth Amendment jurisprudence in giving shape to pretrial detainees' substantive due process rights, that amendment establishes only a minimum standard of care. *Conn v. City of Reno*, 572 F.3d 1047, 1054 (9th Cir. 2009) citing *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003). The Eighth and Fourteenth Amendments both guarantee that inmates and detainees receive constitutionally adequate medical and mental health care. *Conn*, 572 F.3d at 1054. An

---

[4] In his Amended Complaint Mr. Knerr claims he was sexually abused and raped by more than one resident.  Dkt. 18, pp. 14, 17 and 32.  However, in his deposition, he testified to only one sexual assault.  Dkt. 66, Exh. 1 (Deposition of Jesse Knerr, June 16, 2009) at 49-50, 94.

official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment, and *a fortiori*, the Fourteenth. *Conn*, 572 F.3d at 1054-55.

To prevail under the Eighth Amendment standard, a plaintiff must show a defendant acted with deliberate indifference to conditions posing a substantial risk of serious harm. *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009). Deliberate indifference occurs when an official acted or failed to act despite his knowledge of a substantial risk of serious harm. *Id*. Violations of the Eighth Amendment may occur as a result of either an official's act or omission. *Id*. In the prison context, and by analogy, the detainee context, an official may be liable under the Eighth Amendment if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Id*. at 1182. It is not however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety. *Id*. at 1181, citing *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).

To prevail under the Fourteenth Amendment standard, a plaintiff must show a violation of his substantive due process rights. *Oregon Advocacy Center*, 322 F.3d at 1121. Whether a plaintiff's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests. *Youngberg*, 457 U.S. at 321 (1982). In making this determination, the Constitution only requires that the courts make certain that professional judgment in fact was exercised. *Id*. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made. *Id*.

In this case, Mr.Knerr does not allege that Dr. Richards personally participated in the alleged abuse by other SCC residents. He alleges that Dr. Richards negligently supervised SCC

REPORT AND RECOMMENDATION - 18

employees and that Dr. Richards should have known of the alleged conduct. However, for liability to attach, Dr. Richards must have personally participated in the deprivation of rights. No respondeat superior liability exists for § 1983 claims. See *Monell*, 436 U.S. at 690-94. In his deposition testimony, Mr. Knerr testified that Dr. Richards had knowledge of the allegations but did not contact Mr. Knerr again after a meeting in January 2008. Exhibit 1 at 75 ll. 23-25; 76 ll. 1-2.

However, the summary judgment evidence reflects that when Dr. Richards learned of Mr. Knerr's allegations, he personally met with Mr. Knerr to discuss the situation and then directed the SCC psychiatrist assigned to Mr. Knerr to convene a meeting to discuss Mr. Knerr's long term placement options in view of Mr. Knerr's safety concerns. The clinicians group met and made its recommendations to Dr. Richards, who approved of the arrangements made to protect Mr. Knerr, allowing the clinician and program area manager working with Mr. Knerr to develop a plan tailored to his specific safety concerns.

Viewing the foregoing evidence in the light most favorable to Mr. Knerr, the court concludes that Dr. Richards did not act with deliberate indifference. Rather, the evidence indicates that Dr. Richards showed concern, met personally with Mr. Knerr and took specific actions to address Mr. Knerr's safety issues.

The evidence also reflects that Dr. Richards also met the professional judgment standard annunciated in *Youngberg*. Dr. Richards used his professional judgment in directing Mr. Knerr's treating psychiatrist to convene a meeting of clinicians and managers to discuss the situation. It was Dr. Richards' professional judgment that the psychiatrist and employees who treated and dealt with Mr. Knerr and island operations on a daily basis would have the best knowledge of how to treat Mr. Knerr and ensure his safety. Dkt. 67, p. 3. Dr. Richards exercised his

professional judgment in accepting the recommendation of this group and allowing them to operate outside of policy specifically to ensure Mr. Knerr's safety and it was his professional judgment that the situation should be reviewed every month. *Id.*

Because Mr. Knerr cannot show that Dr. Richards failed to exercise professional judgment, he cannot show that Dr. Richards violated his substantive due process rights.

### 2. Conditions in IMU

Mr. Knerr also alleges that, during his time in the quiet room, he was made to sleep on the cement floor on a foam rubber mattress, he had little or no opportunity for exercise, had no natural light and was "initially isolated for 22 to 23 hours a day." *Id.* He alleges further that he was "initially and often" denied legal and personal phone calls, religious items, showers, "time out" an hour out of each 24, books, pen and paper, mail, medical treatment, opportunities to speak to Resident Advocates. *Id.*, p. 11. After he was moved into the IMU quiet room on the Dogwood living unit, Mr. Knerr alleges that he was allowed out of the "cell" from two to three hours a day, but was in all cases shackled at the ankles and made to wear a waist chain. *Id.* He also alleges that he was allowed minimal clothing, legal materials, two reading books and one religious book. *Id.*

Mr. Knerr's allegations regarding the lack of comforts in the IMU and/or the quiet room are not sustainable. Mr. Knerr has failed to provide evidence that he suffered any harm by reason of any alleged deprivation. Although the failure to provide inmates with beds or mattresses is actionable under the Eighth Amendment, *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1448 (9th Cir. 1989); courts have limited relief to those cases in which inmates have suffered harm from sleeping on the floor, e.g., *Martino v. Carey*, 563 F. Supp. 984, 991 (D. Or. 1983) (mattress on floor wet and contaminated from overflowing toilet), or have regularly been

forced to go without a bed. *E.g., Hernandez*, 861 F.2d at 1424 (inmate forced to sleep on mattress on floor for one night did state constitutional claim); *Thompson*, 885 F.2d at 1448-48.

Mr. Knerr's allegation that he had "little or no opportunity for exercise," also does not state a constitutional violation of deprivation of outdoor exercise for an extended period of time. Although "long-term" deprivation of outdoor exercise to prisoners is unconstitutional, Mr. Knerr has provided no evidence, other than his conclusory allegation, that the amount of deprivation which he suffered, if any, does not appear to be so "long-term" so as to raise constitutional concerns. *See LeMaire*, 12 F.3d at 1458; *see, e.g., Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir.2000) (en banc) (denial of outdoor exercise for 6-1/2 weeks meets the objective prong of Eighth Amendment deliberate indifference claim); *Keenan*, 83 F.3d at 1089-90 (plaintiff's undisputed claim of denial of outdoor exercise for six months while in segregation sufficient to proceed to trial); *May v. Baldwin*, 895 F.Supp. 1398, 1406-07 (D.Or. 1995) (deprivation of outdoor exercise for four weeks where plaintiff was able to exercise in his cell was not enough to state an Eighth Amendment claim.

Mr.Knerr has also failed to provide evidence that he actually suffered harm from any lack of exercise.

Likewise, although Mr. Knerr broadly alleges that he was denied "medical care," he provides no facts relating to that denial or evidence of any deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1992), overruled on other grounds, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir.1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *Id*. A "serious"

medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* (citing *Estelle*, 429 U.S. at 104, 97 S.Ct. 285).

Here, there is no evidence of the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment. *See id.* at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir.1990)).

Accordingly, the undersigned recommends that the Court dismiss Mr. Knerr's allegations purporting to state an Eighth Amendment claim against Dr. Richards.

## C.  Right to Access Courts

The Fourteenth Amendment guarantees persons in state custody meaningful access to the courts, a right which is an aspect of the First Amendment right to petition the government for a redress of grievances. *Bill Johnson's Restaurants, Inc. v. National Labor Relations Board*, 461 U.S. 731, 741, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983); *Bounds v. Smith*, 430 U.S. 817, 828, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977). The right of access to the courts "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828 (emphasis added). However, an inmate's constitutional right to access the courts does not include the right to a law library or to legal assistance. *Lewis v. Casey*, 518 U.S. 343, 351, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996). "[P]rison law libraries and legal assistance programs are not ends in themselves, but only the

REPORT AND RECOMMENDATION - 22

means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Id*. at 351 (quoting *Bounds*, 430 U.S. at 825). The purpose is to afford prisoners with the necessary tools they need "to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Id*. at 355.

To prevail on a claim that he has been denied his right to access the courts, a plaintiff must demonstrate some form of "actual injury." *Id*. at 349. Actual injury consists of a specific instance in which the complainant was actually denied access to the courts. *Sands v. Lewis*, 886 F.2d 1166, 1171 (9th Cir. 1989).

Mr. Knerr alleges that SCC has no law library and that he was denied daily calls to his commitment attorney. Dkt. 18, pp. 11, 29-30. However, Mr. Knerr does not allege or provide proof that he has been unable to file claims or pleadings challenging the fact, duration, or conditions of his confinement. In his deposition testimony, Mr. Knerr testified that he could not provide any specific examples of a time when he was precluded from litigating a case or accessing the courts. Dkt. 66, Exh. 1, p. 83, ll. 3-6. In addition, the summary judgment evidence reflects that all of the living units at SCC have on-unit legal computers, complete with legal resources including Westlaw's Premise application. Dkt. 71, p. 1. Databases include the U.S. Supreme Court, Ninth Circuit Court of Appeals, Washington Court of Appeals and Supreme Court cases, the Washington Administrative Code and the Revised Code of Washington. *Id.*, p. 2. Copies of the Prison Litigator's Handbook are also kept in the SCC library. *Id.* SCC subscribes to advance sheets, maintained in binders in the SCC library, for the federal Circuit Courts of Appeal, the U.S. Supreme Court and the Federal Appendix. *Id.* The

REPORT AND RECOMMENDATION - 23

legal network is available for resident use daily from at least 6:00 a.m. to 10:00 p.m., except during resident count. *Id*. The SCC also keeps a number of legal reference books. *Id*.

Morever, Mr. Knerr is represented by counsel in his commitment case. Dkt. 66, Exh. 1, p. 8, ll. 7-10. Providing legal counsel is a constitutionally acceptable alternative to a demand to access a law library. See *Lewis*, 518 U.S. at 350-51 (relying on *Bounds*, 430 U.S. at 830).

As the summary judgment reflects that the SCC does have legal resources available for residents and Mr. Knerr has provided no evidence to show that he has been denied access to courts, he cannot prevail on this issue. Accordingly, the undersigned recommends that summary judgment in favor of Dr. Richards be granted on this issue.

**D.      Eleventh Amendment Immunity -  Damage Claims Against Defendant in His Official Capacity**

Absent a waiver of sovereign immunity, neither states nor state officials in their official capacities are subject to suit in federal court under 42 U.S.C. § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). The limited exception to this rule is found in *Ex Parte Edward T. Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908). In *Young*, the court held that if the suit involves an injunction seeking a prospective remedy for a continuing violation of federal law, a federal court may enjoin state officials from continuing such activities. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997) (citing *Young*).

Therefore, Mr. Knerr cannot prevail on any damage claims against Dr. Richards if they are brought against Dr. Richards in his official capacity. In addition, Dr. Richards argues that to the extent Mr. Knerr claims a right to injunctive relief that might fall within the exception set forth in *Ex parte Young*, those claims fail because Mr. Knerr's claims do not rise to the level of a

constitutional violation. The undersigned agrees. As discussed above and further herein, Mr. Knerr has failed to show a constitutional violation. Therefore, he cannot prevail on any claims for injunctive and declaratory relief.

**E.      Claims of Staff Abuse and Stolen Property – Failure to State a Claim under _Monell_**

Mr. Knerr alleges he was assaulted by staff more than once on May 24, 2006, during a lock down on his unit. Dkt. 44, p. 15. Mr. Knerr does not allege that Dr. Richards knew of, personally participated in, or authorized the alleged event before it occurred. Moreover, in his deposition testimony, Mr. Knerr testified that Dr. Richards was not present during the alleged incident:

> MS. GREENWALD: Okay. Was Dr. Richards there?
> MR. KNERR: No, he was not.
> MS. GREENWALD: Okay. Do you know if he authorized or approved of this?
> MR. KNERR: I don't know whether he was the superintendent at that
> time.

Dkt. 66, Exh. 1 at 86-87.

Mr. Knerr also alleged SCC employees allowed other residents into Mr. Knerr's room while he was under intensive management and that these residents were allowed to steal Mr. Knerr's property. Dkt. 18, pp. 12-13.

Dr. Richards argues that he cannot be held liable for the alleged acts of others based on a theory of respondeat superior liability for § 1983 claims. _Monell_, 436 U.S. at 690-94. The court agrees that Dr. Richards is entitled to judgment regarding these claims as Mr. Knerr has failed to allege and produce evidence reflecting that Dr. Richards knew of, participated in, or authorized any such activities.

REPORT AND RECOMMENDATION - 25

Mr. Knerr alleges further that Dr. Richards should be held liable for the negligent hiring and/or supervision of employees "whom he knows or should know to be unfit or dangerous," such as the employees who assaulted Mr. Knerr.  See e.g., Dkt. 18, p. 32.

An employer may be held liable for the negligent hiring, training, or supervision of an employee when two elements are present. First, the plaintiff must show that the employer knew, or should have known through the exercise of ordinary care, that the employee was unfit. Second, the plaintiff must show that retaining or failing to supervise the employee was a proximate cause of the plaintiff's injuries. *Betty Y. v. Al-hellou*, 988 P.2d 1031, 1032-33 (Wash.Ct.App.1999); *Crisman v. Pierce County Fire Prot. Dist. No. 21*, 60 P.3d 652, 654 (2002).

Mr. Knerr alleges that Dr. Richards allows "deviant, immoral, incompetent and corrupt staff;" that the possession of illegal drugs, alcohol and child pornography in S.C.C. has grown "exponentially" since Dr. Richards became superintendent; provides examples of the "S.C.C. 'environment'", which admittedly do not "directly include Plaintiff," and that Dr. Richards "knew of, ignored, allowed, aided, abetted, encouraged and incited others to engage in acts violating Plaintiff's constitutional rights."  (Dkt. 18, pp. 23-27).  Mr. Knerr further alleges that Dr. Richards has been negligent in the hiring of "often undereducated, individuals who it appears, often have their own personal and psychological problems to include the provision of illegal materials to S.C.C. residents, in direct or indirect consequence to Plaintiff."  (Dkt. 18, p. 30).

Mr. Knerr must do more than allege illegal conduct; he must allege sufficient factual matter, which accepted as true, states a claim to relief that is plausible on its fact.  *Iqbal*, 129 S.Ct. at 1949 quoting *Twombly*, 550 U.S. at 570.  Here, Mr. Knerr has not alleged or presented

evidence that Dr. Richards knew, or should have known through the exercise of ordinary care, that any particular employee was unfit and that the retention or failure to supervise a particular employee was a proximate cause of an injury to Mr. Knerr. As noted above, Mr. Knerr testified at his deposition that Dr. Richards was not present during the alleged assaults and Mr. Knerr could not say that Dr. Richards authorized or approved of the assaults as Mr. Knerr did not know if Dr. Richards was superintendent at the time. Dkt. 66, Exh. 1 at 86-87.

F.     **Claim of Outrage**

Plaintiff claims that the Dr. Richard and/or his employees are liable for intentional infliction of emotional distress. This tort, often referred to as "outrage," requires Plaintiff to prove that a Defendant engaged in either intentional or reckless "extreme and outrageous conduct" and that the conduct caused Plaintiff "severe emotional distress." *Dicomes v. State of Washington*, 113 Wash.2d 612, 782 P.2d 1002, 1012 (Wash.1989). "Extreme and outrageous" conduct is conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citation omitted).

Plaintiff alleges in conclusory fashion that "the conduct of defendant, and/or his employees, has been and is extreme, unnecessary and outrageous in regard to Plaintiff." Dkt. 18, p. 33. Mr. Knerr refers in conclusory fashion to his previous 33 pages of allegations and states that this "covers a portion of all that transpired and affected him during the three and a half years he lived on the Alder West unit." *Id.* The only specific allegation that may be read to support this claim is that "it may have been inappropriate to place him in isolation for extended periods of time, with no psychiatric counseling." *Id.*, p. 34. While one need only provide a short and plain statement to support a claim, that short and plain statement must give fair notice of the

REPORT AND RECOMMENDATION - 27

claim. Plaintiffs' allegations with respect to this claim do not provide such notice. Further, the court has already found that Dr. Richards did not act with deliberate indifference in relying on Dr. Szierbert's recommendation that Mr. Knerr be placed in IMU or later placed in the quiet room under IMU conditions. Therefore, there is no evidence that Mr. Knerr's placement in IMU was extreme and outrageous.

**CONCLUSION**

Mr. Knerr is unable to show any constitutional violations in this matter.[5] His Amended Complaint alleges incidents at SCC that, even if true, do not rise to the level of constitutional significance as he cannot show that Dr. Richards did not exercise professional judgment or personally participated in a deprivation of his rights. Moreover, the only government actions that actually occurred here were clinically based for the purpose of providing constitutionally adequate mental health treatment and are therefore presumptively valid. Mr. Knerr has no competent evidence to overcome that presumption. Accordingly, the undersigned recommends that Defendant's motion for summary judgment (Dkt. 66) be **GRANTED** and that Mr. Knerr's claims against Dr. Richards in this case be **DISMISSED WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the

---

[5] Because he has not shown a constitutional violation, Mr. Knerr's request for a special master to investigate alleged illegal activity or misconduct at the SCC (Dkt. 44, p. 52) must also be denied. Mr.Knerr does not allege that he has been personally injured by any of this alleged activity and he lacks standing to bring these claims on behalf of other residents. Accordingly, the court recommends that this claim be dismissed.

time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **December 11, 2009**, as noted in the caption.

DATED this <u>10th</u> day of November, 2009.

Karen L. Strombom
United States Magistrate Judge